1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT SEATTLE

10   DAMIEN DREIS,                              CASE NO. C14-620 MJP

11                       Plaintiff,             ORDER ON CROSS MOTIONS FOR
                                                SUMMARY JUDGMENT
12           v.

13   DEARBORN NATIONAL LIFE
     INSURANCE COMPANY,
14
                         Defendant.
15

16

17          THIS MATTER comes before the Court on the Parties' cross motions for summary

18   judgment. (Dkt. Nos. 15, 17.) Having reviewed the motions, the Responses (Dkt. Nos. 20, 22),

19   the Replies (Dkt. Nos. 23, 24), and all related papers, the Court hereby DENIES Plaintiff Damien

20   Dreis's Motion and GRANTS in part and DENIES in part Defendant Dearborn National Life

21   Insurance Company's ("Dearborn National's") Motion.

22                                        **Background**

23          Plaintiff Damien Dreis began his career at MetLife, where he worked from 1996 to 2010.

24   (Dreis Dep., Dkt. No. 16, Ex. A at 14:6–13.) While at MetLife, Mr. Dreis worked with several

1  individuals who subsequently moved to Defendant Dearborn National, including Brian Griffin

2  and Larry Meitl. (Id. at 14:20–15:5.) In May of 2010, Mr. Dreis accepted a position as Regional

3  Sales Manager at Dearborn National's Seattle office. (Id. at 14: 12–15.)

4        Mr. Griffin served as Dearborn National's Vice President of Sales and Divisional Vice

5  President of Sales while Mr. Dreis was employed at Dearborn National. (Griffin Dep., Dkt. No.

6  16, Ex. F at 17:23–18:17.) Mr. Meitl served as Dearborn National's Regional Vice President of

7  Sales, with responsibility over sales staff for the Western Region, including Washington State,

8  during the relevant time period. (Dkt. No. 16, Ex. A at 23:20–21.)

9        Due to financial difficulties, Dearborn National began considering the possibility of a

10  reduction in force ("RIF") in September of 2012. (Kozlowski Dep., Dkt. No. 16, Ex. L at 58.)

11  Mr. Dreis states in his deposition testimony that he first learned that Dearborn National was

12  contemplating shutting down its Seattle office in October of 2012, during a conference call with

13  Mr. Griffin and Mr. Meitl. (Dkt. No. 16, Ex. A at 23–24.) In November of 2012, Dearborn

14  National's interim CEO Michael Morrow made an announcement, during a company-wide call,

15  regarding the company's losses and likely actions to address them. (Id. at 13–14.) Sometime in

16  the middle of December 2012, Mr. Dreis began to look for a new job. (Id. at 24.)

17        By late December 2012, Dearborn National decided to eliminate the positions of over 200

18  employees across its many offices. (Dkt. No. 18, Ex. 8 at 9.) Mr. Dreis stated at his deposition

19  that Larry Meitl informed him on January 7, 2013 that his position would be eliminated in the

20  RIF. (Dkt. No. 18, Ex. 3 at 20.) He stated that he asked Mr. Meitl if Dearborn National would be

21  providing employees with a severance package, and that Mr. Meitl responded: "It's, yeah,

22  minimal. Two weeks max." (Id.) Mr. Dreis also stated at his deposition that he asked Mr. Meitl

23  several times between January 7 and February 4 whether there had been, or was likely to be, any

24

change in the amount of severance Dearborn National would offer. (Id.) He stated that Mr. Meitl told him: "No. No, there's not a chance. It's – it is what it is." (Id.) Mr. Dreis further testified at his deposition that both Mr. Meitl and Mr. Griffin encouraged him to seek other employment. (Id. at 23.)

Mr. Meitl agreed at his deposition that, sometime during the first two weeks of January, he told Mr. Dreis that his position was being eliminated in the RIF. (Dkt. No. 18, Ex. 1 at 5.) He stated that he had authority from Mr. Griffin to have that conversation. (Id.) Mr. Meitl also stated at his deposition that Mr. Dreis asked him numerous times whether Dearborn National would provide severance. (Id. at 6.) He stated it was possible that he communicated to Mr. Dreis that severance would be minimal, only a couple of weeks. (Id.) He further stated that prior to the first conversation in which he told Mr. Dreis his position would be eliminated, he had not been told "what" the severance would be. (Id. at 7; Dkt. No. 25, Ex. 2 at 6.)

Mr. Dreis interviewed with Guardian Life Insurance ("Guardian") on January 8, 2013. (Dkt. No. 16, Ex. N at 7.) He was offered a position with Guardian on January 18, 2013. (Dkt. No. 18, Ex. 3 at 14.) On February 4, 2013 Mr. Dreis sent the following email to Mr. Meitl and Mr. Griffin:

> Brian/Larry—thanks for the great opportunity. Unfortunate ending and out of all of our control. Thanks for always going to bat for me. Please accept this note as my resignation effective today.
> Thanks, Damien

(Dkt. No. 16, Ex. T at 34.) Mr. Dreis stated at his deposition that on that same day, he printed the email out, signed it, dated it February 5, 2014, scanned it, and sent it back to Mr. Meitl. (Dkt. No. 16, Ex. 3 at 33–36.) He testified that Mr. Meitl called him the morning of February 5 and asked him to resend the email and date it February 4. (Id. at 37.) On February 5, Mr. Dreis sent a

1   second letter to Mr. Meitl which stated: "Please accept this note as my resignation and two week

2   notice, effective February 4, 2013." (Dkt. No. 16, Ex. U at 36.) This letter was signed and dated

3   February 4, 2013. (Id.) Mr. Dreis's first day of work at Guardian was February 5. (Dkt. No. 16,

4   Ex. 3 at 40.)

5        Dearborn National had RIF and severance payment policies in place prior to the 2013

6   RIF. (See Dkt. No. 18, Ex. 10 at 17–26.) These policies require that RIF separation package by

7   presented to an employee after the employee "has been notified by management of his/her or her

8   [sic] job elimination." (Id. at 21.) The policies further provide that during the presentation of the

9   RIF package, employee services will discuss separation benefits with the affected employee.

10   (Id.) At his deposition, Dearborn National's corporate representative stated "the timing is that the

11   RIF notification date and the receipt of the packet is very close together . . . the objective is

12   within 24 hours." (Burghard Dep., Dkt. No. 18, Ex. 5 at 9.) He testified that the reason for this is

13   that "to be fair to employees that as quickly as is possible, from the moment in time that you're

14   notified of your job elimination, you have a packet of information delivered to you so that you

15   understand all of the effects of what that means to you in your situation so you're not left with a

16   great deal of time to wonder." (Id.)

17        Dearborn National had a separate policy in place that described how severance would be

18   calculated. (Dkt. No. 18, Ex. 11 at 28.) Per this policy, severance for someone in Mr. Dreis's

19   position with equivalent tenure and pay would include one year of base pay and a year of

20   incentive bonus pay. (Dkt. No. 18, Ex. 5 at 9–10.) In Mr. Dreis's case, this amount was over

21   $600,000. (Id.)

22        The severance packages were delivered to Dearborn National employees on February 19.

23   (See Dkt. No. 16, Ex. R at 26.)

24

1    Mr. Dreis brought this suit against Dearborn National on March 29, 2014 in King County

2  Superior Court. (Compl., Dkt. No. 1, Ex. 1 at 7.) Dearborn National subsequently removed the

3  case to federal court. (See id.) Mr. Dreis asserts the following claims against Dearborn National:

4  (1) breach of contract; (2) wrongful withholding of wages; (3) breach of contractual duty of good

5  faith and fair dealing; (4) fraud; and (5) negligent misrepresentation. (Id.) The Parties have filed

6  cross-motions for summary judgment. (Dkt. Nos. 15, 17.)

7                                                    **Analysis**

8    I.      Legal Standard

9        Summary judgment is not warranted if a material issue of fact exists for trial. Warren v.

10  City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). The underlying facts are viewed in the light

11  most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio

12  Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that

13  a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

14  Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show

15  initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress &

16  Co., 398 U.S. 144, 159 (1970). Once the moving party has met its initial burden, however, the

17  burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an

18  element essential to that party's case, and on which that party will bear the burden of proof at

19  trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). To discharge this burden, the

20  nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there

21  is a genuine issue for trial. Id. at 324.

22

23

24

II.     Dearborn's Motion for Summary Judgment

Dearborn National argues the Court should grant summary judgment in its favor as to all of Mr. Dreis's claims and dismiss the claims with prejudice.

A.  Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing

Mr. Dreis concedes that his breach of contract and breach of the duty of good faith and fair dealing claims should be dismissed, so the Court GRANTs Dearborn National's Motion as to Mr. Dreis's breach of contract and breach of the duty of good faith and fair dealing claims. (See Dkt. No. 20 at 4.)

B.  Negligent Misrepresentation

Plaintiff argues Dearborn National negligently misrepresented the size of his severance package when Mr. Meitl told Mr. Dreis on several occasions that his severance would be "minimal" and would represent "two weeks" of pay at a "max[imum]" and when Dearborn National failed to disclose in a timely fashion either the true severance figure or the way severance is calculated. (See Pltf's MSJ, Dkt. No. 17 at 9–10.)

The Court will first address a point discussed primarily in Defendant's Reply in support of its Motion for Summary Judgment: the contention that the interactions at issue here did not constitute a "commercial" or a "business transaction" as required in both affirmative and failure-to-disclose negligent representation claims. (See Dkt. No. 23 at 10.) Although the argument may have intuitive appeal, Black's Law Dictionary defines "business transaction" as "an action that affects the actor's financial or economic interests, including the making of a contract." Black's Law Dictionary 241 (10th ed. 2014). Mr. Dreis's decision to tender his resignation to Dearborn in light of his imminent layoff and allegedly minimal severance is undoubtedly an action affecting his financial interests. Washington courts have accepted "business transactions" taking place within the employer-employee context, though it is true that the cases Plaintiff cites

1   concern representations made in the course of securing employment rather than during the

2   employment relationship. See, e.g., Flower v. T.R.A. Indus., Inc., 127 Wn. App. 13, 23 (2005).

3   Meanwhile, Dearborn National's citation to cases in other jurisdictions is unpersuasive, and

4   Trimble v. Wash. State Univ., 140 Wn.2d 88, 98 (2000), does not foreclose the possibility of a

5   business transaction during employment because the case was decided on a failure to show

6   breach generally, not a business transaction specifically. (See Dkt. No. 22 at 13–15.) The Court

7   concludes that Washington courts would not grant summary judgment to Defendant on the basis

8   that Mr. Dreis failed to point to a business transaction.

9        Defendant also argues that under Washington law, the tort of negligent misrepresentation

10   arises only in the context of quasi-fiduciary relationships. (Dkt. No. 15 at 21.) In fact, a negligent

11   misrepresentation claim "can be based on either an affirmative misstatement or a failure to

12   disclose information," WPI 165.00 (6th ed.), and a special or quasi-fiduciary relationship is only

13   required in a claim based on a failure to disclose information. Id. (citing Restatement (Second) of

14   Torts §§ 552, 551) ("The standards for a failure to disclose information require additional proof,

15   including proof that the defendant owed a special duty to disclose the information to the

16   plaintiff."). Furthermore, while a "special relationship" is required in a failure-to-disclose

17   context, a strict fiduciary relationship is not. See Colonial Imports, Inc. v. Carlton Northwest,

18   Inc., 121 Wn.2d 726, 732 (1993). The requirement that the speaker "proclaim[ ] expertise or

19   [have] a financial stake in the matter under consideration" is also specific to the failure-to-

20   disclose theory. See id. at 732–33.

21        1.   Failure to Disclose

22        "One who fails to disclose to another a fact that he knows may justifiably induce the

23   other to act or refrain from acting in a business transaction is subject to the same liability to the

24

1    other as though he had represented the nonexistence of the matter that he has failed to disclose,

2    if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in

3    question." Colonial Imports, 121 Wn.2d at 731 (quoting Restatement (Second) of Torts §§ 551).

4        The employer-employee relationship is not necessarily a special or quasi-fiduciary

5    relationship giving rise to such a duty. See Branting v. Poulsbo RV, No. 66754–8–I, 2012 WL

6    5192764, *6 (Wn. App. Oct. 22, 2012). While Plaintiff assumes that the entity "Dearborn

7    National" can be held accountable for failure to disclose information within its knowledge, a

8    corporation can only act through its employees, agents, directors, or officers. See Scott v. Ross,

9    140 F.3d 1275, 1280–81 & n.1 (9th Cir. 1998); 9th Cir. Civ. Jury Instr. 4.2 (2007). With respect

10   to Dearborn and/or HCSC's HR employees, Mr. Dreis does not allege he consulted those

11   employees on a regular basis, or indeed that he ever spoke to them. Cf. Lipscomb v. Farmers Ins.

12   Co. of Wash., 142 Wn. App. 20, 32 (2007). With respect to Mr. Meitl, there was a far closer

13   relationship. A special relationship arises where "there is a quasi-fiduciary relationship, where a

14   special relationship of confidence and trust had developed between the parties, where a party

15   relies on the specialized and superior knowledge of the other party, where a party has a statutory

16   duty to disclose, or where a seller knows a material fact that is not easily discoverable by the

17   buyer." Van Dinter v. Orr, 157 Wn.2d 329, 334 (2006) (emphasis added). Here, Mr. Meitl's

18   position as the direct supervisor of Mr. Dreis may have given rise to such a relationship where

19   Mr. Dreis was relying on him to provide actionable information to which Mr. Dreis did not have

20   access.

21       Both the special relationship characteristics and the elements of duty-to-disclose-based

22   negligent misrepresentation also presuppose that Mr. Meitl had knowledge of the information at

23   issue. See id.; Pope v. Univ. of Wash., 121 Wn.2d 479, 493 (1993) ("A precondition for finding

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 8

1    liability is knowledge of the facts alleged to have been concealed or not disclosed."); WPI

2    165.03; Restatement (Second) of Torts § 551(2) (defining the subject of most failure to disclose

3    claims as "matters known to him" or "facts basic to the transaction, if he knows that the other is

4    about to enter into it under a mistake as to them") (emphasis added). Here, there is no direct

5    evidence that Mr. Meitl knew the size of Mr. Dreis's severance package or how severance was

6    calculated. (See Meitl Dep., Dkt. No. 16, Ex. E at 65:3–23; Kozlowski Dep., Dkt. No. 16, Ex. L

7    at 36:4–37:1.) But there is circumstantial evidence that Mr. Meitl was withholding relevant

8    information that he did know. Plaintiff points to Mr. Meitl's close relationship with a high-level

9    supervisor, the fact that Mr. Meitl was not looking for a job while telling Mr. Dreis to seek one,

10   and several communications that occurred on February 5 after Mr. Dreis had begun work at his

11   next employer. (See Dkt. No. 20 at 13.) One email from Mr. Meitl to Mr. Griffin on February 5th

12   suggests that Mr. Meitl was excited about the size of his own severance offer given the subject

13   line "My Packet !!!" and the body of the email, which expressed interest in traveling to

14   headquarters in Chicago on the day severance offers were to be distributed. (See Dkt. No. 16, Ex.

15   CC.) There is also the strange and inadequately explained set of facts relating to Mr. Meitl's

16   request that Mr. Dreis change the date on his resignation letter. When the evidence is viewed in

17   the light most favorable to Mr. Dreis, a jury could conclude by clear, cogent, and convincing

18   evidence that Mr. Meitl had relevant knowledge sufficient both to support a special relationship

19   between Mr. Dreis and Mr. Meitl and to hold Dearborn National liable for Mr. Meitl's failure to

20   disclose that information.

21              2.  Affirmative Misrepresentation

22        There are also disputed material facts that foreclose summary judgment as to the

23   negligent misrepresentation claim based on affirmative misrepresentations. "A plaintiff claiming

24

negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages." Ross v. Kirner, 162 Wn.2d 493, 499 (2007). These elements are drawn from the Restatement (Second) of Torts § 552. See ESCA Corp. v. KPMG Peat Marwick, 135 Wn.2d 820, 826 (1998). No special relationship is required for liability based on affirmative misrepresentations.

Dearborn National can cite no law requiring the defendant to be "in the business of providing commercial advice for the guidance of others," as opposed to providing advice for the guidance of the plaintiff in his business transactions, as the elements of the tort adopted in Washington provide. (See Dkt. No. 22 at 13–15; Dkt. No. 23 at 8–9.) Because negligent misrepresentation liability can attach to the employer where the employee had actual or apparent authority to make such a representation, Dearborn National cannot establish at summary judgment that the statements of Mr. Meitl cannot be attributed to Dearborn National. See Smith v. Hansen, Hansen & Johnson, Inc., 63 Wn. App. 355, 362–63 (1991). Although both actual and apparent authority depend on representations by the principal, Mr. Meitl was Regional Vice President of Sales with responsibility over Dearborn National's sales staff for the Western Region, including Mr. Dreis. (Meitl Dep., Dkt. No. 16, Ex. E at 24:20–22.) Agency is therefore a question of fact for the jury. Smith, 63 Wn. App. at 362.

1    Dearborn National also argues Mr. Meitl's statements were not about a presently existing

2    fact. (See Dkt. No. 23 at 9.) Washington courts have given mixed messages about whether this is

3    a prerequisite to negligent representation liability, sometimes within the same case. See, e.g.,

4    Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 180–82 (1994). Even assuming that a statement

5    referring to a presently existing fact is required in Washington, the Court concludes there are

6    material issues of fact as to whether Mr. Meitl's representations about Mr. Dreis's severance

7    package effectively misrepresented facts reflected in extant Dearborn National or HCSC policy

8    documents about how severance was calculated for employees of Mr. Dreis's position and pay

9    grade. (See Dkt. No. 16, Exs. Q, Z, AA; Burghard Dep., Dkt. No. 18, Ex. 5 at 53:17–55:10.)

10   Furthermore, unlike cases in which Washington courts refused negligent misrepresentation

11   claims on this ground, Mr. Dreis's claims about Mr. Meitl's representations cannot be confused

12   with a claim for breach of contract or promissory estoppel based on a promise of future conduct

13   because Mr. Dreis does not wish to bind Dearborn National to Mr. Meitl's promises regarding a

14   "minimal" severance payment; instead, he asserts that Mr. Meitl's false representations led him

15   to act in a way inconsistent with his interests (but beneficial to Dearborn National). Cf. Havens;

16   Micro Enhancement Intern., Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 436 (2002). A

17   negligent misrepresentation claim is consistent with these facts, so long as Mr. Meitl acted

18   negligently in obtaining or communication the false information and Mr. Dreis reasonably relied

19   on it—additional questions of fact for the jury.

20   Accordingly, the Court denies Dearborn National's motion for summary judgment as to

21   Mr. Dreis negligent misrepresentation claim.

22

23

24

C.  Fraud

The nine elements of a fraud claim under Washington law are: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff. Stiley v. Block, 130 Wn.2d 486, 505 (1996). "Each element of fraud must be established by clear, cogent and convincing evidence." Id. (internal quotation marks and citations omitted).

Dearborn National argues summary judgment should be granted on the fraud claim in part because "[n]o competent evidence establishes that anyone at Dearborn National would benefit in any way from Mr. Dreis not receiving a severance payment." (Dkt. No. 15 at 20 (emphasis omitted).) This argument is without merit, because Mr. Dreis is not required to establish motive in order to prevail on his fraud claim. Even if motive were required, a jury could easily conclude that Mr. Meitl had an incentive to save his employer money. To the extent Dearborn National is arguing Mr. Dreis falls short on the "intent . . . that [the representation] should be acted upon" element, there is ample evidence that Mr. Meitl was simultaneously encouraging Mr. Dreis to find other work.

Dearborn National also argues Mr. Meitl's statements were not representations about existing facts. (Dkt. No. 15 at 20.) This argument is addressed in the negligent misrepresentation discussion, above.

Dearborn National finally argues the Court should grant summary judgment as to Mr. Dreis's fraud claim because "Mr. Meitl had no idea what severance payments would actually be" at the time he made the purported statements to Mr. Dreis. (Dkt. No. 15 at 20 (emphasis

1  omitted).) Mr. Dreis contends this argument is off base because "the question is not what <u>Mr.</u>

2  <u>Meitl</u> knew; the question is what <u>Dearborn</u> knew. This lawsuit alleges that Dearborn committed

3  fraud—not Mr. Meitl." Since a corporation can act only through its officers or employees, <u>see</u>

4  <u>Scott</u>, 140 F.3d at 1280–81 & n.1, knowledge attributed solely to the corporation and not to the

5  agent making the false representation cannot prevent summary judgment as to that element of the

6  fraud claim.

7          As Mr. Dreis also points out regarding the knowledge element, there is older Washington

8  case law to the effect that "a person cannot defeat recovery [on a claim of fraud] by showing that

9  he did not know his representations were false or that he believed them to be true, if he made

10 them recklessly and carelessly without knowing for certain whether they were true or false."

11 <u>Swanson v. Solomon</u>, 50 Wn.2d 825, 828 (1957); <u>see also</u> 16 Wash. Prac., Tort L. & Prac. §19:6

12 (4th ed.) ("One who is reckless in ascertaining the truth or falsity of his representation is in no

13 better position than one who knows the falsity of his representation."). (Note that the standard is

14 not, as Mr. Dreis suggests, "recklessly" <u>or</u> "carelessly," which would imply mere negligence

15 would suffice.) It is questionable whether current Washington law accepts the lesser recklessness

16 standard, particularly in light of the Washington pattern jury instructions, which impose a

17 knowledge standard. <u>See</u> WPI 160.01 (citing <u>Stiley v. Block</u>, 130 Wn.2d 486 (1996); <u>Hoffer v.</u>

18 <u>State</u>, 110 Wn.2d 415 (1988)) (listing the fourth element as "[t]he speaker's knowledge of its

19 falsity"); <u>but see</u> <u>Matter of Estate of Lint</u>, 135 Wn.2d 518, 533 n.4 (1998) (in context of

20 fraudulent procurement of will, listing fourth element of fraud as "knowledge of the falsity or

21 reckless disregard as to its truth"). Recent Washington cases have criticized attempts to alter this

22 element of the pattern jury instructions to a standard as low as negligence, <u>see</u> <u>Harrison</u>

23 <u>Memorial Hosp. v. Department of Natural Resources</u>, No. 25538–3–II, 2001 WL 767855, *7

24

(Wn. App. July 10, 2001), and have granted summary judgment on the grounds that there was no evidence to suggest the defendant "actually knew" the falsity of the representation. See Hyytinen v. City of Bremerton, No. 45117–4–II, 2014 WL 7462565, *9 (Wn. App. Dec. 30, 2014). At the same time, recent federal district court cases applying Washington law have occasionally cited a recklessness standard for the fourth element. See, e.g., Maring v. PG Alaska Crab Inv. Co., LLC, No. C05–326JLR, 2006 WL 328400, *2 (W.D. Wash. Feb. 10, 2006) (citing Farrell v. Score, 67 Wn.2d 957, 958 (1966)) (listing fourth element as "knowledge of the falsity or reckless disregard as to its truth" and "knowledge of its falsity or ignorance of its truth," respectively).

Because the jury will be asked to decide whether Plaintiff has proven by clear, cogent, and convincing evidence that Mr. Meitl had "knowledge of [the representation's] falsity" per the pattern jury instructions, the Court concludes that evidence of recklessness is insufficient. As discussed above in the section on negligent misrepresentation liability based on a failure to disclose, there is evidence in the record which, when viewed in the light most favorable to Mr. Dreis, indicates that Mr. Meitl knew that the severance would not be "minimal" and would not represent two weeks pay at a maximum.

D.  Wrongful Withholding of Wages

Dearborn National argues that, even if the Court allows Mr. Dreis's underlying claims to proceed, Mr. Dreis is not entitled to double damages that he seeks under Washington's wage payment statutes, because the record "conclusively demonstrates a bona fide dispute regarding whether someone who voluntarily resigns from a company to work for a competitor is entitled to be paid severance by that company as a part of company-wide staff reduction." (Dkt. No. 15 at 23.)

"The critical determination in a case under RCW 49.52.070 for double damages is whether the employer's failure to pay wages was 'willful.'" Schilling v. Radio Holdings, Inc.,

1    136 Wn.2d 152, 159 (1998). Washington courts have recognized that an employer's failure to

2    pay wages is not willful where "a bona fide dispute existed between the employer and the

3    employee regarding the payment of wages." Id. at 160. "The dispute must be a 'bona fide,' i.e., a

4    'fairly debatable' dispute over whether an employment relationship exists, or whether all or a

5    portion of the wages must be paid." Id. at 161. The burden falls on the employer to show the

6    bona fide dispute exception applies. Washington State Nurses Ass'n v. Sacred Heart Med. Ctr.,

7    175 Wn.2d 822, 834 (2012).

8          Mr. Dreis argues summary judgment in Dearborn National's favor is inappropriate

9    because: (1) Dearborn's violation of its own RIF policy (i.e. its failure to notify Mr. Dreis that he

10   was entitled to severance benefits) negates any argument that its failure to pay Mr. Dreis was

11   based upon a bona fide dispute; and (2) viewing the evidence in the light most favorable to Mr.

12   Dreis, Mr. Dreis's resignation date was February 5 and, because of Dearborn's internal policies

13   about the notice period, he was still employed at Dearborn on February 19, the date severance

14   and RIF packets were distributed. (Dkt. No. 20 at 13–16.)

15         Failure to follow an internal policy about the timing of information about severance

16   benefits does not contradict the fact Dearborn has the burden to establish at summary judgment:

17   that its decision not to pay Mr. Dreis severance was "fairly debatable," creating a bona fide

18   dispute between Dearborn and Mr. Dreis. Mr. Dreis cannot point to any legal obligation for

19   Dearbon National to follow its internal policy regarding the timing of the provision of

20   information regarding severance benefits, much less evidence that would render its decision not

21   to pay severance benefits based on different internal policies wrong beyond dispute.

22         As to Mr. Dreis's theory that he was employed by Dearborn National on February 19,

23   Dearborn National offers evidence that Mr. Dreis tendered his resignation on February 4, 2013,

24

1   effective that day. (Dkt. No. 16–3 at 34.) Dearborn National further states that, per its policy, an

2   employee's "effective termination date" is usually his or her "last active day worked." (Dkt. No.

3   15 at 12 n.6; Dkt. No. 16, Ex. V at 38) ("Termination of employment will normally be effective

4   on the employee's last active day worked, regardless of the day the employee receives formal

5   notice of the termination."). Mr. Dreis argues Dearborn National rejected his February 4

6   resignation when it asked him to redo his resignation letter on February 5 and backdate it. (Dkt.

7   No. 20 at 4.) Mr. Dreis presents evidence that his second resignation letter was drafted on

8   February 5 and that it clarified that the note represented "my resignation and two week notice,"

9   though it also stated it was "effective February 4, 2013." (Dkt. No. 21–4 at 2.) On the basis of the

10  two weeks' notice period and/or his last pay date, Mr. Dreis offers a complicated argument that

11  Mr. Dreis was still employed at Dearborn (two weeks from February 5) on February 19, the date

12  severance and RIF packets were provided to Dearborn National employees—even though he was

13  working at his new employer well before that date. (Dkt. No. 20 at 15.)

14          Mr. Dreis also submits evidence showing that when Dearborn National employees

15  communicated their intent to resign with two week's notice (see, e.g., Dkt. No. 18, Ex. 16 at 45

16  ("As of today [3/22/2013], I am tendering my two week notice.")), Dearborn HR employees

17  calculated two weeks from that date, considered the last day in the period (4/5/2013) the

18  "termination date" and/or "LDW" (last day worked) and the day afterward (4/6/2013) the

19  "effective date." (Id. at 44; see also id. at 43.) Alternately, the "effective date" was defined

20  internally as the "day after their last day paid." (Id. at 43.) But even viewing the evidence in the

21  light most favorable to Mr. Dreis, these emails clearly suggest that an employee ceases being an

22  employee on the "effective date" two weeks and a day after notice is provided and/or a day after

23  the last day paid, regardless of the slightly different meaning assigned to "effective" dates in the

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 16

official policy. (Cf. Dkt. No. 16, Ex. V at 38.) While Mr. Dreis's "two week notice" letter did not, in fact, provide two weeks' notice prior to his actual last day at the office, Dearborn National continued paying him for six days of the succeeding February 11, 2013, to February 24, 2013, pay period, making his "last day paid" February 18, 2013. (Dkt. No. 18, Ex. 15 at 39; Dkt. No. 17 at 19.)

Either by entertaining the theory that Mr. Dreis did not actually provide two weeks' notice, making him no longer a Dearborn employee as of February 5, 2013, or the theory that based on his last day paid he was no longer an employee as of February 19, 2013, a reasonable jury would be unable to avoid the conclusion that Dearbon National had a "fairly debatable" position that Mr. Dreis was not an employee when RIF packets were distributed on February 19. Mr. Dreis's more complicated theory, involving both a true resignation on February 5 and a "notice period" Mr. Dreis did not actually work (but which he was nonetheless paid for, with the exception of the final day of the alleged period, February 19), could charitably be viewed as plausible, but not overwhelmingly persuasive. The Court therefore grants summary judgment to Dearborn National as to the wrongful withholding of wages claim on the basis that no reasonably jury could conclude there was no bona fide dispute over whether the severance package was owed.

III.     Mr. Dreis's Motion for Summary Judgment

Mr. Dreis argues the Court should grant summary judgment in his favor on his negligent misrepresentation and wrongful withholding of wages claims. (Dkt. No. 17 at 1–2.)

A.  Negligent Misrepresentation

Although the specific arguments made by Dearborn National as to affirmative negligent misrepresentation are unavailing for reasons addressed above, the Court, viewing the evidence in the light most favorable to Dearborn National, finds there nonetheless exist genuine issues of

1    material fact preventing the issuance of summary judgment in Mr. Dreis's favor, among them

2    Mr. Meitl's agency, whether Mr. Meitl acted negligently in obtaining or communicating the false

3    information, and whether Mr. Dreis reasonably relied on it.

4         The Court therefore denies summary judgment on negligent misrepresentation.

5         B.  Wrongful Withholding of Wages

6         Because the Court grants summary judgment to Dearborn National on the wrongful

7    withholding of wages claim, it denies summary judgment to Mr. Dreis on that claim.

8                                     **Conclusion**

9         The Court GRANTS Dearborn National's motion for summary judgment as to Mr.

10   Dreis's breach of contract, breach of the duty of good faith and fair dealing, and wrongful

11   withholding of wages claims, DENIES Dearborn National's motion as to Mr. Dreis's negligent

12   misrepresentation and fraud claims, and DENIES Mr. Dreis's motion for summary judgment in

13   full.

14

15        The clerk is ordered to provide copies of this order to all counsel.

16        Dated this 23rd day of July, 2015.

17

18

19

       Marsha J. Pechman
20     Chief United States District Judge

21

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT- 18