The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DAMIEN DREIS,<br><br>        Plaintiff,<br><br>vs.<br><br>DEARBORN NATIONAL LIFE INSURANCE COMPANY, a foreign corporation,<br><br>        Defendant. | Case No. 2:14-cv-00620-MJP<br><br>**DEFENDANT'S TRIAL BRIEF**<br><br><br>TRIAL DATE:<br>September 8, 2015 |

## I.    SUMMARY OF THE CASE

This is an employment lawsuit in which Plaintiff Damien Dreis ("Dreis") claims that Defendant Dearborn National Life Insurance Company ("Dearborn National") deceived him into resigning his job approximately two weeks before he would have been offered a severance payment as part of Dearborn's 2013 reduction-in-force ("RIF"). In fact, Dreis resigned because, after learning he might be laid off, he quickly arranged to take a job with Guardian Life Insurance Company, Dearborn National's competitor. Dreis did not want to remain with Dearborn National as it transitioned out of the Seattle market, and he did not want to jeopardize the new employment opportunity he had arranged with Guardian. So, Dreis quit rather than risk being unemployed, even temporarily.

The case hinges on three related factual questions:

**DEFENDANT'S TRIAL BRIEF** - 1

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

(a) Did Dreis's supervisor (and friend), Regional Vice President of Sales Larry Meitl, negligently misrepresent to Dreis that any severance payment that Dreis might be offered by Dearborn National would be "minimal" or "two weeks max"?;

(b) Did Larry Meitl have authority to discuss severance with Dreis in the first place?; and

(c) If both of these questions are answered affirmatively, did Dreis reasonably rely on Mr. Meitl's statements by intentionally resigning his employment before Dearborn National extended severance offers?

Following the Court's Order on the parties' cross-motions for summary judgment (ECF No. 35), these factual issues relate to Dreis's three remaining causes of action:

- plaintiff's claim for negligent misrepresentation by affirmative misstatement;
- plaintiff's claim for negligent misrepresentation by failure to disclose; and
- plaintiff's claim for fraud.

The burden of proof on every element of each of these three claims, including damages, is "clear, cogent, and convincing" evidence.

Dearborn National is entitled to judgment in its favor on each of Dreis's claims. First, Dreis cannot prove a critical threshold issue: that Larry Meitl had authority to discuss or negotiate severance on Dearborn National's behalf. Larry Meitl, who was also being laid off, was not Dearborn National's agent regarding severance payments at the company. Dearborn National never represented that Mr. Meitl had this authority, and no reasonable person would have believed that he did.

Second, with respect to Dreis's claim for negligent failure to disclose, Dreis cannot prove that a relationship of trust and confidence existed between him and Dearborn National. Such a relationship must be shown in order for any legal duty to have existed on Dearborn National's part to disclose any potential severance offer to Mr. Dreis. If the jury finds that no special relationship existed, then, as a matter of law, no duty to disclose existed, and this claim fails. The evidence will show, and the jury will conclude, that after Dearborn National gave warning to

**DEFENDANT'S TRIAL BRIEF** - 2

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

Dreis that it planned to terminate his employment, Dreis was on clear notice that Dearborn National was acting out of economic necessity, and not for Dreis's benefit.

Third, Dreis will be unable to prove that his supposed reliance on Larry Meitl's alleged statements was reasonable. Dreis knew when Dearborn National would issue layoff notices and extend severance offers—"late February or early March." Dreis resigned anyway. Dreis failed to make reasonable efforts to find out what severance offer Dearborn National might extend to him in late February or early March, or to remain employed and determine what the severance would be, rather than what he alleges Meitl told him it might be. In sum, the only thing Dreis did was talk to his friend and close co-worker, Larry Meitl—a fellow employee who always prefaced any speculation about severance by explicitly stating, "I don't know." And, indeed, Mr. Meitl *did not know* how severance offers would be calculated. Like Dreis, Mr. Meitl was also being laid off, and had no basis to know what severance offers might be.

Fourth, Dreis's claim for fraud will be unsuccessful. No evidence of any kind, let alone clear, cogent and convincing evidence, supports the necessary elements of the claim: namely, that Mr. Meitl knew the amount of severance Dearborn National might offer Dreis and, knowing that amount, intentionally mislead Dreis, intending for him to resign before receiving a severance offer.

Finally, even if the jury does find in Dreis's favor, any damages Dreis might be awarded will be significantly reduced in proportion to the fault Dreis himself bears for resigning before severance offers were extended. Washington courts (and the applicable pattern jury instructions) are clear that Dearborn National may assert the defense of contributory negligence in response to Dreis's negligence claims. Indeed, Dearborn National's defense of contributory negligence is held to a lower standard of proof than are Dreis's claims, a preponderance of the evidence. And, the jury will understand that Mr. Dreis bears most, if not all, of the fault for resigning before being offered a severance payment.

Judgment should be entered in Dearborn's favor, and the Plaintiff's claims dismissed.

**DEFENDANT'S TRIAL BRIEF** - 3

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

## II. FACTS AND EVIDENCE

The evidence presented to the jury will show the following:

### A. Dearborn National

Dearborn National sells insurance and financial products. It is a subsidiary of Health Care Service Corporation, a large customer-owned health insurer. At all times relevant to this case, Dearborn National was headquartered in Illinois, in the greater Chicago area. Dearborn National had operations nationwide, including in Seattle. In the Seattle market, Dearborn National sold primarily life insurance and dental insurance through employer-provided benefit plans. The Seattle office of Dearborn National employed three people: Regional Vice President of Sales Larry Meitl; Damien Dreis, who was a Sales Executive; and Sarah Johnson. Ms. Johnson is not a witness in this case.

### B. Damien Dreis

Dreis applied to work for Dearborn National on May 10, 2010. Prior to applying to work at Dearborn National, Dreis worked at a competitor, MetLife, from 1996 to 2010. While at MetLife, Dreis worked with several people who subsequently moved to Dearborn National, including Brian Griffin and Larry Meitl. At Dearborn National, Mr. Meitl had supervisory responsibility over Dearborn National's sales staff in the western region, including Washington State. Mr. Griffin was the Senior Divisional Vice President of Sales, the national head of sales at Dearborn National.

Mr. Griffin, Mr. Meitl, and Dreis were all professional friends from their time together at MetLife. After Mr. Meitl hired Dreis to work at Dearborn National in 2010, Mr. Meitl and Dreis worked together closely, and shared an office suite in downtown Seattle. They frequently ate lunch together, and talked almost every day.

Dreis was a very successful insurance salesman at Dearborn National. In particular, he sold a substantial number of group dental policies to large employers for them to provide as part of their benefit plans for employees. However, the dental policies that Dreis was selling were

**DEFENDANT'S TRIAL BRIEF** - 4

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

underpriced for the level of insurance coverage they provided to customers, and were causing Dearborn National to sustain substantial financial losses, particularly on the West Coast.

### C. Dearborn National's 2013 RIF

Beginning in September 2012, senior management at Dearborn National learned that the company as a whole was unprofitable, due in large part to its line of dental insurance. As a result, Dearborn National executives began to consider how to address the company's financial difficulties. Initially, these discussions occurred under CEO Craig Nordyke; however, around this same period, Mr. Nordyke was replaced with Interim CEO Michael Morrow.

On November 7, 2012, during a company-wide call, Mr. Morrow disclosed to all Dearborn National employees that the company was going to have to take cost-saving measures that would affect them (i.e., layoffs).

Shortly thereafter, during a trip to Portland, Maine, on November 28–30, 2012, Brian Griffin confirmed to a number of Sales Executives, including Dreis, that there would be layoffs at the company. Mr. Griffin also made clear that specific decisions about layoffs had not been made. Mr. Griffin was accurate in saying this: Dearborn National management had not yet decided which, if any, employees would be laid off.

### D. Dreis's Decision to Resign

As soon as Dreis returned to Seattle from Maine, he began actively searching for another job, and continued to do so through the first two weeks of December 2012. Because not all of the Sales Executives at Dearborn National had been on the trip to Maine, Dreis was able to contact Dearborn National's competitors before the hiring managers at those companies had any idea that Dearborn National was in financial trouble, or that Dreis's sales record was largely based on an underpriced product that sold itself. And, Dreis took full advantage of what he perceived as an opportunity to abandon a company that was experiencing financial difficulties.

On December 13, 2012, Mr. Dreis emailed his resume to at least two people. One of these was a recruiter named Jan Bublitz. Ultimately, Ms. Bublitz recruited Dreis to work at

**DEFENDANT'S TRIAL BRIEF** - 5

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

Guardian Life Insurance Company, a competitor of Dearborn National.

On December 31, 2012, New Year's Eve, Dreis received a text message stating "They're shutting you down" from a man named Mark Metille, who Dreis describes as a general insurance agent and "a friend of Brian Griffin." Mr. Metille has no association with Dearborn National and has never been a Dearborn National employee. The following day, January 1, 2013, Dreis received an email from Ms. Bublitz stating, "Guardian's going to do some interviews next Thursday," which was January 8, 2013, and "Can you come down for this?" Mr. Dreis immediately agreed to interview for a position with Guardian.

### E. Larry Meitl's Alleged Statements about Severance

On January 7, 2013, the day before Dreis's interview with Guardian, Brian Griffin, the national head of sales, held a previously scheduled conference call with Dearborn National's various regional vice presidents of sales, which included Larry Meitl. During the call, Mr. Griffin explained that Dearborn National's turnaround plan would likely include a decision to cease making new sales on the West Coast—in other words, that Dearborn National would be withdrawing from the entire West Coast market, including Seattle. But, Mr. Griffin said nothing about layoffs at specific offices or of specific employees, or when decisions about these issues should be expected.

After the conference call ended, Dreis and Larry Meitl had a conversation in their office suite in Seattle. During that conversation, Larry Meitl shared with Dreis what Brian Griffin had said on the regional vice president's call, namely that Dearborn National would likely be ceasing all new sales on the West Coast. Mr. Meitl also asked if Dreis had arranged any job interviews already. Dreis responded that he had an interview in Phoenix with Guardian the next day.

As part of this discussion, Dreis asked Mr. Meitl if Dearborn National would be making severance offers to employees affected by layoffs. Mr. Meitl responded, "I don't know." During these discussions, Dreis always understood that Mr. Meitl was also likely to be laid off. Mr. Meitl also believed this to be true, and knew nothing about the size of severance payments either

**DEFENDANT'S TRIAL BRIEF** - 6

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

he or Dreis might be offered by Dearborn National if they were laid off as they expected.

During a number of other conversations over the course of the next several days, Dreis again asked Mr. Meitl what kind of severance payment Dearborn National might offer him. Each time Dreis asked, Mr. Meitl responded that he did not know. During some of these conversations, Mr. Meitl also speculated that Dearborn National might offer a "standard corporate" severance package. Dreis understood the phrase "standard corporate" severance package to mean that he would be offered "minimal" severance, which he thought meant "two weeks max" of his annual take-home pay.

In 2012, Dreis earned $607,779.84. Two weeks of pay at this annual rate is $23,376.15. Dreis considered this amount of money to be "insignificant."

### F. Dreis's Voluntary Resignation Was Not Reasonable

Dreis made no efforts of any kind to verify either Mr. Meitl's speculation that Dearborn National would offer "standard corporate" severance packages, or his own unsupported assumption that a "standard" severance offer meant two weeks of pay. Moreover, he knew the date he would receive a RIF notice and severance (late February or early March) and he resigned to take new employment with Guardian prior to that date. He could have easily just waited. At a minimum, even if he believed he would have received "only" two weeks of severance, he made a conscious decision to walk away from two weeks' pay, or approximately $23,000. Neither Dreis's decision to rely on Meitl's alleged statements, nor his decision to resign, were reasonable under the circumstances of this case.

### G. Larry Meitl's Lack of Authority to Discuss Severance with Dreis

At no point during Dreis's employment did Dearborn National make any representation of any kind to the effect that Larry Meitl had the authority to discuss or negotiate the amount of severance Dreis might be offered if he were laid off.

The sole evidentiary bases that Dreis asserts in order to claim that Larry Meitl was acting as Dearborn National's agent with respect to Dearborn National's 2013 layoffs is the fact that

**DEFENDANT'S TRIAL BRIEF** - 7
Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

Mr. Meitl was his direct supervisor, and the fact that Mr. Meitl's title was "Regional Vice President of Sales." But Dreis admits that he always understood that Mr. Meitl was also going to be laid off in the 2013 RIF—i.e., that Mr. Meitl was in the exact same position as Dreis himself. And, Mr. Meitl was in fact laid off. Indeed, Mr. Meitl never knew what severance Dearborn might offer him until he himself was notified that he would be losing his job.

**H.     Dreis's Resignation**

The day after Dreis learned that Dearborn National would be discontinuing new sales on the West Coast, January 8, 2013, instead of working, he traveled to Phoenix to attend the interview with Guardian that he had arranged the week before.

The day after that, January 9, 2013, Dearborn National informed employees when layoffs would begin (and thus when severance offers would be extended). Specifically, Interim CEO Michael Morrow sent Dearborn National employees a company-wide email communicating that the timeline for the RIF notifications would be "late February or early March":

> The obvious questions are "Will I be affected?" and "When will I find out?" Senior staff is currently working on detailed 2013 budgets and staffing plans. Once that step is completed, there are human resources and legal processes we need to follow. I anticipate that we will be able to make announcements in late February or early March. I recognize that waiting like this is hard on all of you, and we will work to accelerate the timetable if at all possible.

Mr. Meitl also separately told Dreis, verbally, that RIF notifications would occur in "late February, early March."

Mr. Dreis accepted another position with Guardian a little over a week later, on January 18, 2013. He then went on vacation in Hawaii.

On February 4, 2013, Mr. Dreis emailed Larry Meitl and Brian Griffin, resigning without notice, "effective today":

**DEFENDANT'S TRIAL BRIEF** - 8
Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

> Brian/Larry – thanks for the great opportunity. Unfortunate ending and out of all of our control. Thanks for always going to bat for me. Please accept this note as my resignation effective today.
> Thanks, Damien

Dreis began his new job Guardian the very next day, February 5, 2013.

On February 19, 2013, Dearborn National issued its first layoff notifications and made its first severance offers to employees. Dearborn National did this exactly when it had informed employees that it would, in "late February." Because Dreis had resigned on February 4, 2013, and was no longer a Dearborn National employee on February 19, 2013, he was not laid off by Dearborn National, and so was not offered any severance payment.

### III. PLAINTIFF'S CLAIMS AND DEFENDANT'S DEFENSES

#### A. Plaintiff's Claims

1. Negligent misrepresentation by affirmative misstatement.
2. Negligent misrepresentation by failure to disclose.
3. Fraud.

#### B. Defendant's Affirmative Defenses

1. Failure to state a claim / insufficiency of the evidence.
2. Contributory negligence.

### IV. LEGAL ISSUES THAT MUST BE RESOLVED BY THE COURT

#### A. Comparative Fault Applies to Negligent Misrepresentation Claims

Under the Restatement (Second) of Torts ("Restatement") §§ 551 and 552, which Dreis agrees govern his claims for negligent misrepresentation by affirmative misstatement and failure to disclose, Dearborn National's defense of contributory negligence is specifically and expressly permitted. *See* Restatement § 552A ("The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying.").

Washington courts have also explicitly found that this defense is available and appropriate for negligent misrepresentation claims of the type Dreis asserts in this case. Indeed,

**DEFENDANT'S TRIAL BRIEF** - 9

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

the Washington Supreme Court has held that a "negligent misrepresentation claim is the type of action for which the uniform comparative fault statute applies." *ESCA Corp. v. KPMG Peat Marwick*, 135 Wn.2d 820, 831, 959 P.2d 651 (1998) ("The uniform comparative fault statute applies to any action that is (1) based on fault and (2) seeks recovery for 'harm to property.' The statute defines fault as 'acts or omissions . . . that are in any measure negligent . . . toward the person or property of the actor or others . . . .'") (citing RCW 4.22.015).

Failing to instruct the jury on Dearborn National's defense of contributory negligence would be clear error.

### B. WPIs on Agency Must Not Be Collapsed, Combined, and Altered to Mr. Dreis's Benefit and to the Prejudice of Dearborn National

Dreis's proposed jury instructions on agency combine various standard Washington Pattern Instructions into a single jumbled and hard-to-understand instruction. In addition to omitting the titles of the various component instructions (which tell the jury what the instructions relate to), this approach collapses numerous discrete definitions and operative instructions into one long narrative of unclear meaning.

The "Note on Use" included with the WPI instructions on agency specify how they are to be given to the jury. Dreis's proposed agency instruction deviates from these directions, without explanation.

Dreis omits any explanation for this approach because it is an attempt to gloss over the crucial question of whether Larry Meitl had apparent authority to act as Dearborn National's agent with respect to severance offers. This unfairly prejudices Dearborn National.

Rather than adopt this legally erroneous approach, the Court should utilize the unmodified versions of the WPIs on agency.

### C. Any Verdict Form Should Require the Jury to Make a Specific Factual Determination as to Larry Meitl's Agency

Whether Larry Meitl had authority to bind Dearborn National with respect to his alleged statements about severance is a key, threshold factual inquiry, upon which all of Dreis's claims


**DEFENDANT'S TRIAL BRIEF** - 10

Case No. 2:14-cv-00620-MJP

depend. The Court, therefore, should submit a specific question to the jury asking whether Larry Meitl had authority to act as Dearborn National's agent with respect to severance. Because no evidence exists that Dearborn National *itself* represented to Dreis that Mr. Meitl had such authority, the jury instruction that should be used in combination with this question is the WPI on apparent authority, WPI 50.02.01.

D. **Any Verdict Form Should Also Require That the Jury Specifically Decide Whether the Relationship Between Dearborn National and Dreis Supported a Duty to Disclose Severance Offers Before Making Them**

The WPIs also expressly provide that, in negligent misrepresentation cases where there is an issue about whether the plaintiff and defendant had a sufficiently close relationship to create a duty to disclose, the jury should be specifically asked whether such a relationship existed. *See* WPI 165.04, "Note on Use" (instruction should be used for where there is an issue as to whether "a relationship of trust and confidence" existed that could support a duty to disclose, and recognizing that "[f]actual issues will often exist for these relationships"); *see also* WPI 165.03.01, "Duty To Disclose—Mixed Issues of Fact And Law" ("Whether the defendant had a duty to disclose will often be determined by the judge as a matter of law during pre-trial proceedings. For those cases in which a factual issue precludes a decision as a matter of law, this instruction may be used to submit the factual issue to the jury."); WPI 165.03.02, "Duty To Disclose—Mixed Issues of Fact And Law—Special Verdict Form" (recommended for use in factual circumstances identical to those of this case, to accompany WPI 165.03.01).

Here, the Court has already ruled that whether the relationship between Dreis and Dearborn National can support a duty to disclose is a factual issue for the jury. *See* Order on Cross-Motions for Summary Judgment (ECF No. 35), at 9:16–20 ("When the evidence is viewed in the light most favorable to Mr. Dreis, a jury could conclude by clear, cogent, and convincing evidence that Mr. Meitl had relevant knowledge sufficient both to support a special relationship between Mr. Dreis and Mr. Meitl and to hold Dearborn National liable for Mr. Meitl's failure to disclose that information."). Accordingly, it is necessary to submit to the jury the question of

**DEFENDANT'S TRIAL BRIEF** - 11

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

whether, as Dreis's employer, Dearborn National was advising him for his own benefit. If the jury does not find in Dreis's favor on this threshold question, he cannot maintain a claim based on a duty to disclose.

The WPIs provide specific instructions for this scenario, including a special verdict form. Failure to use them would be error.

### E. Dreis's Burden of Proof as to Damages is "Clear, Cogent, and Convincing" Evidence

Dreis erroneously seeks to have the Court instruct the jury that his burden of proof with respect to damages is preponderance of the evidence. In fact, Washington law is unambiguous that, for both negligent misrepresentation claims and fraud claims, damages must be proved by clear, cogent, and convincing evidence. *See Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007) ("A plaintiff claiming negligent misrepresentation must prove *by clear, cogent, and convincing* evidence that . . . the false information proximately caused the plaintiff damages."); *Pedersen v. Bibioff*, 64 Wn. App. 710, 722–23, 828 P.2d 1113 (1992) ("the plaintiff bears the burden of proving *all essential elements* of fraud by clear, cogent and convincing evidence") (citing *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 457 P.2d 603 (1969)).

Instructing the jury as Dreis requests would be error.

### F. Emotional Distress Damages Are Not Available for Negligent Misrepresentation Claims

Dreis also erroneously seeks to have the Court instruct the jury that it may award damages for emotional distress if it finds in his favor on his negligent misrepresentation claims. But, emotional distress damages are not available for negligent misrepresentation claims, which are by their very nature business torts, not personal injury torts. Under Restatement §§ 551 and 552, claims for negligent misrepresentation under either theory that Dreis alleges (affirmative misstatement and failure to disclose) *expressly* relate to damages only for "pecuniary loss." *See* Restatement § 552B ("The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the *pecuniary loss* to him of which the

**DEFENDANT'S TRIAL BRIEF** - 12
Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

misrepresentation is a legal cause.") (emphasis added); *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 150, 787 P.2d 8 (1990) (Restatement applies to claims of negligence by affirmative misrepresentation); *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 180, 876 P.2d 435 (1994) (applying Restatement to claims of negligence based on failure to disclose). Moreover, as a general principle of Washington law, damages flowing from alleged violations of the obligations inherent in the employment relationship, such as payment of wages owed or breaches of the employment contract, cannot support an award of emotional distress damages. *See Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 447–48, 815 P.2d 1362 (1991). Here, because the only basis for damages that Dreis asserts is a business loss (as opposed to, for example a claim for discrimination or retaliation), emotional distress damages are not appropriate or available as a matter of law.

The Court should not allow the jury to award emotional distress damages in relation to Dreis's negligent misrepresentation claims. To do so would be error.

### G. It Is Not Appropriate to Direct the Jury to Find Any Specific Damages Amount

Here, Dearborn National has a defense of contributory negligence. Dreis nonetheless seeks to have the Court instruct the jury that it must find that Dreis is owed a specific monetary amount by Dearborn National. Because this approach would effectively negate Dearborn National's defense, such an instruction would be error.

## V. FACTUAL ISSUES THAT MUST BE RESOLVED BY THE JURY

### A. Did Larry Meitl Have Apparent Authority to Act as Dearborn National's Agent with Respect to Severance Offers?

As recognized by the Court's Order on the parties' cross-motions for summary judgment, whether Larry Meitl was acting within the scope of his authority as an agent of Dearborn National is a central and threshold factual question for the jury. This question should be specifically submitted to the jury as part of the special verdict form. This is so because, without submission of the specific question to the jury, a real and substantial risk exists that the jury

**DEFENDANT'S TRIAL BRIEF** - 13

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

could conclude that Larry Meitl's alleged representations to Dreis, upon which this entire case is based, were made without authority, but nonetheless find in Dreis's favor on his liability theories.

The *only* potentially negligent or fraudulent representations that are potentially at issue in this case are those that were allegedly made to Dreis by Larry Meitl. Specifically, in his Complaint, Dreis alleges no misrepresentations of any kind other than that Dearborn National supposedly conveyed to him that there would not be "any meaningful severance," something only Mr. Meitl is alleged to have commented on, and that Mr. Meitl specifically said that any severance "would be minimal." (*See* ECF No. 1-2, at 3 ¶¶ 2.5–2.6.)

Each of Mr. Dreis's remaining causes of action in this case expressly depend on whether or not a "representation" was made to Mr. Dreis. Because the only person that Dreis alleges made any "representation" to him is Larry Meitl, whether Mr. Meitl was acting Dearborn National's agent in making these supposed representations is a central factual question that must be specifically resolved by the jury.

### B. Did Dearborn National and Damien Dreis Have a Relationship of Sufficient Trust and Confidence to Support a Claim for Negligent Misrepresentation by Failure to Disclose?

As discussed above, whether Dearborn National owed Dreis any duty to disclose the amount of severance payments that it intended to offer depends on a factual finding that Dearborn National and Dreis had the kind of relationship of trust and confidence that could support such a duty. If this kind of relationship did not exist, then Dearborn National owed Dreis no duty, and his negligence claim based on failure to disclose must be dismissed as a matter of law. Accordingly, this factual question must be directly submitted to the jury.

### C. Was Dearborn National Negligent by Affirmatively Misrepresenting to Damien Dreis the Amount of the Severance Payment He Would Be Offered?

The parties agree that the WPI on this issue should be submitted to the jury.

**DEFENDANT'S TRIAL BRIEF** - 14

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

### D. Was Dearborn National Negligent by Failing to Disclose to Damien Dreis the Amount of the Severance Payment He Would Be Offered?

If a relationship existed between Dearborn National and Dreis that could support a duty to disclose, the WPIs on this issue should be submitted to the jury.

### E. Did Dearborn National Engage in Fraud?

The parties agree that the WPI on this issue should be submitted to the jury.

### F. If the Jury Finds Dearborn National Liable, What Amount of Damages Did Damien Dreis Suffer?

Dreis's damages, if any, are a question of fact for the jury. However, the instructions to the jury and the special verdict for should make clear that emotional distress damages are only available if the jury finds that Dearborn National committed fraud. And, again, damages on every claim in this case must be found by "clear and convincing" evidence.

### G. If Dearborn National Was Negligent, What Amount of Mr. Dreis's Damages Resulted from His Own Negligence Rather than Dearborn National's?

If the jury finds Dearborn National liable to Dreis for negligence, it must also determine what measure of Dreis's damages are Dreis's fault, rather than Dearborn National's.

## VI. CONCLUSION

Dreis unilaterally decided to resign his employment with Dearborn National to work for a competitor because he did not want to risk being unemployed. As a result, he left before Dearborn National offered severance packages to employees who were being laid off. Mr. Dreis was not offered a severance package, because he was no longer an employee of Dearborn National, and was not being laid off. There is nothing even remotely unlawful about this. A verdict should be entered in Dearborn National's favor.

// // //

// // //

// // //

// // //

**DEFENDANT'S TRIAL BRIEF** - 15

Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300

Dated: August 19, 2015

*/s/ Thomas P. Holt*
Thomas P. Holt, WSBA No. 39722
tholt@littler.com
James G. Zissler, WSBA No. 30287
jzissler@littler.com
**LITTLER MENDELSON, P.C.**
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
Telephone: 206.623.3300
Facsimile: 206.447.6965

Attorneys for Defendant
DEARBORN NATIONAL LIFE
INSURANCE COMPANY, a foreign
corporation

**DEFENDANT'S TRIAL BRIEF** - 16
Case No. 2:14-cv-00620-MJP

# CERTIFICATE OF SERVICE

I am a resident of the State of Washington, over the age of eighteen years, and not a party to the within action. My business address is One Union Square, 600 University Street, Ste. 3200, Seattle, WA 98101. I hereby certify that on August 19, 2015, I electronically filed the foregoing **DEFENDANT'S TRIAL BRIEF** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the Honorable Marsha J. Pechman and to the following:

**Attorneys for Plaintiff**

**Michael S. Wampold, WSBA #26053**
**Mallory C. Allen, WSBA #45468**
**PETERSON WAMPOLD ROSATO LUNA KNOPP**
**1501 Fourth Ave., Suite 2800**
**Seattle, WA 98101-1609**

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated August 19, 2015

　　　　　　　　　　　　　　　　　　*/s/ Leili Moore*
　　　　　　　　　　　　　　　　　　Leili Moore
　　　　　　　　　　　　　　　　　　LEMoore@littler.com
　　　　　　　　　　　　　　　　　　**LITTLER MENDELSON, P.C.**

Firmwide:135351592.2 075686.1002

**DEFENDANT'S TRIAL BRIEF** - 17
Case No. 2:14-cv-00620-MJP

LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101.3122
206.623.3300